UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ZIRIN TAX COMPANY, INC., *doing business as Steven-Louis Income Tax Centers*; THE HOLTZ GROUP, INC.; STEVEN A. HOLTZ,

        *Plaintiffs,*

– against –

UNITED STATES OF AMERICA, *by and through the Commissioner of the Internal Revenue Service,*

        *Defendant.*

**MEMORANDUM & ORDER**
24-cv-01511 (NCM) (MMH)

---

**NATASHA C. MERLE**, United States District Judge:

Before the Court is plaintiffs' Motion for Preliminary Injunction, ECF. No. 3,[1] to restore their electronic filing identification numbers ("EFINs"), which the Internal Revenue Service ("IRS") suspended on February 13, 2024. Plaintiffs Zirin Tax Company, Inc. ("Zirin"), doing business as Steven-Louis Income Tax Centers, The Holtz Group Inc. (together with Zirin, "SL Tax"), and Steven A. Holtz are in the tax preparation business and bring this action against the United States, by and through the Commissioner of the IRS, for alleged violations of the Administrative Procedure Act, 5 U.S.C. § 702, and the due process protections of the Fifth Amendment to the United States Constitution, U.S. Const. amend. V. For the reasons stated herein, plaintiffs' Motion is **DENIED**.

---

[1] The Court hereinafter refers to Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, ECF No. 3-1, as the "Motion." Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

1

## BACKGROUND

### A. Plaintiffs' Tax Business

Plaintiffs are in the "tax preparation business." Compl. ¶ 3, ECF No. 1. SL Tax has operated in Brooklyn since 1970 and now also maintains an office in Manhattan. Compl. ¶¶ 8, 9. Plaintiffs' stated mission "has always been to provide people of modest means with the personal and attentive service generally available to those with higher incomes, to maximize their available income." Compl. ¶ 8. To that end, plaintiffs prepare and electronically file roughly 2,000 tax returns with the IRS each year. Compl. ¶¶ 12, 16.

Plaintiffs began using the IRS's e-filing system around 1990 and have since relied on that method for submitting the majority of their customers' returns. Holtz Decl. ¶ 7, ECF No. 3-2; Prelim. Inj. Hr'g Tr. 55:4–8, ECF No. 20. In order to e-file, plaintiffs maintain two EFINs, one for each of their two offices. Holtz Decl. ¶ 8. The majority of SL Tax's business involves filing federal taxes with the IRS.[2] Prelim. Inj. Hr'g Tr. 81:12–15.

### B. IRS E-filing

Since 1990, taxpayers have been able to electronically file their federal returns with the IRS. Def.'s Opp'n Mot. 9, ECF No. 10. The vast majority of returns are filed this way. Opp'n at 9 n.1. Roughly half of the electronically filed returns the IRS received last year were prepared by tax professionals. Opp'n at 9. In order to file returns electronically, tax preparers must apply for and use an EFIN. Opp'n at 9. A tax preparation business must use its Employer Identification Number or the sole proprietor's Social Security number

---

[2]   The government notes that "Plaintiffs offer other services as well, like corporate entity formation and financial statement analysis[.]" Opp'n at 26; *see also* Denault Decl. 3, ECF No. 10-5 (screenshot of SL Tax's website). However, Mr. Holtz testified at the hearing that SL Tax does not charge for advisory services. *See* Prelim. Inj. Hr'g Tr. 57:9–21.

to apply for an EFIN.[3] Applicants must pass a "suitability check" to be approved, which can involve "a credit check; a tax compliance check; a criminal background check; and a check for prior non-compliance with IRS e-file requirements."[4]

Once approved, the IRS deems these businesses "Authorized IRS e-file Providers."[5] The IRS monitors e-filers for compliance with agency requirements and may sanction filers for infractions that violate those requirements. Publication 3112 at 2, 19. The IRS has outlined three levels of infractions: Level One Infractions are those with "little or no adverse impact" on the quality of returns or the e-filing system, Level Two Infractions are those with an "adverse impact," and Level Three Infractions involve a "significant adverse impact." *Id.* at 20. Sanctions are tiered accordingly, ranging from a written reprimand to "suspension, expulsion or other legal action." *Id.* at 2, 20.

In 2009, Congress mandated electronic filing for any entity that expects to file more than ten returns per calendar year. *See* 26 U.S.C. § 6011(e)(3); Worker, Homeownership, and Business Assistance Act of 2009, H.R. 3548, 111th Cong. § 17 (2009) (effective for returns filed after December 31, 2010).

---

[3] *See FAQs About Electronic Filing Identification Numbers (EFIN)*, I.R.S. (Nov. 28, 2023), https://www.irs.gov/e-file-providers/faqs-about-electronic-filing-identification-numbers-efin [https://perma.cc/C8VE-D6PK].

[4] *See Become an Authorized E-file Provider*, I.R.S. (Aug. 16, 2023), https://www.irs.gov/e-file-providers/become-an-authorized-e-file-provider [https://perma.cc/UP8W-AJP4].

[5] *See* I.R.S. Publ'n 3112, *IRS e-file Application and Participation* 2 (Nov. 2023), https://www.irs.gov/pub/irs-pdf/p3112.pdf [https://perma.cc/2RB8-BZUC] ("Publication 3112").

3

### C. *The Investigation*

In or around April of 2023, plaintiffs' customers and an SL Tax employee received letters and subpoenas from the IRS. Weinstein Decl. ¶ 7, ECF No. 3-3. On June 6, 2023, plaintiffs' counsel met with IRS investigators, who informed them of an investigation into "potentially fraudulent reporting of casualty and theft losses." Wojtanowski Decl. ¶ 6, ECF No. 10-3; *see also* Weinstein Decl. ¶¶ 9, 10. Specifically, the IRS investigators believed plaintiffs submitted fraudulent reports of casualty, theft, and bad debt losses, as well as charity contribution deductions, on behalf of their customers. Wojtanowski Decl. ¶ 6. During that meeting, IRS investigators shared tables displaying the percentage of SL Tax customer returns claiming such deductions, along with the average losses reported. Wojtanowski Decl. ¶ 6. The investigators also shared redacted excerpts of customer returns with allegedly inaccurate information. Wojtanowski Decl. ¶ 6.

After the June 2023 meeting, plaintiffs began to require their customers to affirm in writing that the bases for any charitable donation, bad debt, or stolen property deductions were accurate. Holtz Decl. ¶ 15; *see also* Weinstein Decl. ¶ 11. Additionally, during the 2023 tax season, plaintiffs required customers to review their returns in detail and attest to the accuracy of all information. Holtz Decl. ¶ 16. Plaintiffs' counsel informed the IRS investigators of these changes at a subsequent meeting on August 29, 2023. Weinstein Decl. ¶ 12. According to plaintiffs' counsel, they relayed this information "not because [plaintiffs] were concerned that [they] previously had done anything that was impermissible – but to allay any potential concerns by the IRS that Plaintiffs would be encouraging their clients to take inappropriate or unsubstantiated deductions." Weinstein Decl. ¶ 12. The primary IRS investigator, Special Agent Cody Wojtanowski,

4

testified that he did not consider plaintiffs' "compliance changes" when deciding whether to seek the suspension of their EFINs. Prelim. Inj. Hr'g Tr. 11:23–12:16.

During a third meeting on December 8, 2023, IRS investigators informed plaintiffs' counsel that they anticipated referring the matter to the U.S. Department of Justice's Tax Division for potential prosecution, Wojtanowski Decl. ¶ 9, but provided no indication that the IRS was at that time considering revoking SL Tax's EFINs, Weinstein Decl. ¶¶ 14, 15.

On December 21, 2023, Agent Wojtanowski consulted the agency's Return Preparer Program coordinator in New York regarding a potential suspension of plaintiffs' EFINs. Wojtanowski Decl. ¶ 11. After additional consultation with the agency's Refund Fraud and Investigative Support ("RFIS") team and approval by Agent Wojtanowski's manager, the request was transferred to RFIS on January 10, 2024. Wojtanowski Decl. ¶¶ 12, 13.

### D. E-filing Suspension and Litigation

By the end of January, the IRS had opened its e-filing windows for business and individual returns. Compl. ¶ 14. Shortly thereafter, on February 13, 2024, RFIS approved the suspension of SL Tax's EFINs. Elton Decl. ¶ 7, ECF No. 10-4. Plaintiffs discovered two days later that many of their customers' returns had been rejected. Weinstein Decl. ¶¶ 18, 19; Holtz Decl. ¶¶ 20, 21. SL Tax later called the IRS e-filing help desk and the EFIN unit and learned that its EFINs had been revoked at the request of Agent Wojtanowski. Holtz Decl. ¶¶ 22, 23.

At the request of plaintiffs' counsel, Agent Wojtanowski scheduled a video meeting for February 22, 2024. Weinstein Decl. ¶ 22. Less than an hour before the call was scheduled to begin, Agent Wojtanowski emailed to plaintiffs' counsel a one-page letter

5

dated the next day and announcing SL Tax's EFIN suspension for a period of two years. Weinstein Decl. ¶ 23; *see also* Holtz Decl. ¶¶ 25. The letter provided the following reason for the suspension: "Criminal Investigation has determined that fraudulent returns have been filed." Weinstein Decl. ¶ 24. At the meeting, IRS investigators provided no additional details as to the suspension. Weinstein Decl. ¶ 27.

On February 28, 2024, plaintiffs filed this action followed by their Motion. After full briefing by both parties, the Court held a hearing on the Motion on April 2, 2024 (the "Hearing"), at which Agent Wojtanowski and Mr. Holtz provided testimony. On April 3, 2024, the parties submitted post-hearing briefing regarding, among other issues, irreparable harm. *See* Pls.' and Def.'s Post-Hr'g Brs., ECF Nos. 17, 18.

## DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right," and is only warranted upon a clear showing by plaintiff that he is entitled to relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008).[6] In order to establish that such a remedy is warranted, the movant must show "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *Connecticut State Police Union v. Rovella*, 36 F.4th 54, 62 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 215 (2022). When a movant seeks to "stay government

---

[6]     Throughout this Opinion, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

6

action taken in the public interest pursuant to a statutory scheme," the more rigorous prong of likelihood of success applies, rather than the serious question prong. *Id.*

Because plaintiffs seek a mandatory injunction that "alters the status quo" and "command[s] some positive act"—here, that the IRS reinstate the EFINs—"[a] heightened standard is imposed[.]" *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023). "Under the heightened standard, [plaintiffs] must show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm." *Id.* at 669.

Plaintiffs have presented strong arguments as to their likelihood of success, particularly with respect to their Fifth Amendment procedural due process claim. The facts presented thus far raise concern as to whether the IRS provided plaintiffs with notice of the EFIN suspension that would allow them an "opportunity to be heard at a meaningful time and in a meaningful manner," as required by the Fifth Amendment. *Progressive Credit Union v. City of New York*, 889 F.3d 40, 52 (2d Cir. 2018). The government's argument that plaintiffs know more about the investigation than they are indicating on the record—and thus received notice—is wanting. *See* Prelim. Inj. Hr'g Tr. 96:21–97:6 ("They know much more about the status of the investigation and what the IRS is looking at than the IRS is under any legal obligation to provide them, because they had those meetings, they've talked to their customers. So they know what the IRS is looking at."). Nor would any presumed or actual knowledge plaintiffs have ascertained bear on the government's due process obligations. *See Spinelli v. City of New York*, 579 F.3d 160, 172 (2d Cir. 2009) ("The fact that [plaintiff's] counsel eventually learned of the specific nature of the charges after meeting on various occasions with the City does not obviate the City's failure to provide adequate notice of those charges.").

7

Further, the question remains whether plaintiffs were *entitled* to constitutional due process during the suspension of their EFINs. Contrary to the defendant's argument, it is not clear that plaintiffs were not due any such protection. As stated at the Hearing, the cases cited by the government are threadbare on the question presented here: whether plaintiffs have a property interest in their EFINs that are required for them to electronically file their customers' returns. *See* Opp'n at 23–24.

For example, the government relies on a decision decided prior to Congress' electronic filing mandate for certain tax preparers. *See* Opp'n at 23–24 (citing, among other cases, *Forehand v. I.R.S.*, 877 F. Supp. 592, 595 (M.D. Ala. 1995)). In that case, the court found no constitutionally-protected property interest in a license to e-file with the IRS because the plaintiff did not provide an "independent source of law guaranteeing her an entitlement" to e-file. *Forehand*, 877 F. Supp. at 595. However, in this circuit, absent such an express guarantee, courts must assess the extent of the agency's "discretion to revoke" a business license when determining whether a plaintiff has a protected property interest in that license. *See Spinelli*, 579 F.3d at 169 (finding property interest in gun license where licensor's "discretion was carefully constrained" and "cabined" by a good cause requirement). Moreover, the considerations for the analysis here may be different in light of the 2009 Congressional e-filing mandate. *Contra* Opp'n at 24 (citing *Snyder & Assocs. Aquisitions LLC v. United States*, 133 Fed. Cl. 120 (2017)); *Snyder* 133 Fed. Cl. at 125–26 (finding "no independent right to receive EFINs and participate in the IRS e-filing program" without addressing the 2009 Congressional e-filing mandate).

Nevertheless, the Court need not reach the likelihood of success prong where a movant fails to make the requisite showing of irreparable harm. *See Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 359 (2d Cir. 2024) (each

8

of the irreparable harm and likelihood of success prongs provide an "independent basis for denying preliminary relief"); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) ("[T]he moving party must first demonstrate that [irreparable] injury is likely before the other requirements for the issuance of an injunction will be considered."). Here, plaintiffs have not made a strong showing of irreparable harm for the reasons stated below. Accordingly, the Court does not analyze the likelihood of success of plaintiffs' claims at this time and denies plaintiffs' request for a preliminary injunction.

*Irreparable Harm*

The Court "begin[s] with the single most important prerequisite for the issuance of a preliminary injunction: irreparable harm." *Daileader*, 96 F.4th at 358. The purpose of preliminary relief is to prevent "actual and imminent" injury that cannot be undone if the moving party prevails on the merits. *See JTH Tax*, 62 F.4th at 672. In assessing whether a party will suffer irreparable harm, the Court must consider whether "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). Courts must determine whether irreparable harm will flow based on the specific facts of the case. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) ("[C]ourts may no longer simply presume irreparable harm[.]").

Furthermore, "a request for an injunction will be denied when remedies available at law, such as monetary damages, are adequate to compensate for the injury." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 504 (2d Cir. 2014). The movant must therefore show that the harm is such that he cannot be made whole through monetary damages. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). Indeed, "[t]he

9

Second Circuit has consistently stressed that . . . [a] monetary loss will not suffice" as irreparable harm "unless the movant provides evidence of damage that cannot be rectified by financial compensation." *Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994). And although a party may "wish[] to have" financial compensation "now rather than later[,] . . . compensation need only be adequate for preliminary relief to be unwarranted, not perfect." *Daileader*, 96 F.4th at 358.

This is true even where a party asserts constitutional injury. *See A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) ("In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm."); *see also Garland v. New York City Fire Department*, 574 F.Supp.3d 120, 132 (E.D.N.Y. 2021) (holding preliminary injunction inappropriate where movant fails to "make a strong showing of constitutional harm that cannot be compensated" monetarily). While it is true that courts generally "presume that a movant has established irreparable harm . . . if the movant's claim involves the alleged deprivation of a constitutional right," such a presumption "is triggered only where the alleged constitutional deprivation is convincingly shown and that violation carries *noncompensable damages*." *Gazzola v. Hochul*, 645 F. Supp. 3d 37, 55 (N.D.N.Y. 2022), *aff'd*, 88 F.4th 186 (2d Cir. 2023) (emphasis added).

Nevertheless, movants can show irreparable harm arising from financial circumstances when "the very viability of the plaintiff's business is threatened" absent an injunction, *JTH Tax*, 62 F.4th at 668, or "where the injunction will prevent damage to the business as a whole," *RxUSA Wholesale, Inc. v. Dep't of Health & Hum. Servs.*, 467 F. Supp. 2d 285, 301 (E.D.N.Y. 2006), *aff'd sub nom. Dep't of Health & Hum. Servs., U.S.*

*Food & Drug Admin. v. RxUSA Wholesale, Inc.*, 285 F. App'x 809 (2d Cir. 2008). This is because "'the right to continue a business . . . is not measurable entirely in monetary terms,' especially when that business is essential to the [party's] manner of living." *JTH Tax*, 62 F.4th at 668 (quoting *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970)).

Where, for example, a business represents years of effort and is the livelihood for its owners, closure of such a business could not be compensated by monetary damages and could establish irreparable harm. *JTH Tax*, 62 F.4th at 668 (citing *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York*, 749 F.2d 124, 125–26 (2d Cir. 1984)). However, "decreased sales alone are insufficient to constitute irreparable harm" because monetary damages can make the movant whole for such an injury. *Gazzola*, 645 F. Supp. 3d at 56. "[T]o constitute irreparable harm, allegations of lost sales must be sufficiently large in proportion to the plaintiff's operations that the loss of the amount of money involved would cause extreme hardship to the business, or even threaten destruction of the business." *Astellas Pharma US, Inc. v. Food & Drug Admin.*, 642 F. Supp. 2d 10, 22 (D.D.C. 2009) (citing *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

Here, plaintiffs assert irreparable harm by way of financial harm. Specifically, they allege that suspension of their EFINs "poses a severe, and potentially existential, risk to SL Tax's business," Pls.' Reply Mem. Law 3, ECF No. 12; *see also* Pls.' Post-Hr'g Br. at 2–3, as they will not be able to "maintain a tax preparation business without the ability to e-

11

file," Mot. at 6.[7] At the Hearing, Mr. Holtz further testified that if the EFIN suspension continues, he "will not have a business." Prelim. Inj. Hr'g Tr. 75:18–20.

Although plaintiffs' assertions cause the irreparable harm alarm bells to ring, they are not sufficiently supported by the record. *See Gazzola*, 645 F. Supp. 3d at 57 (finding "conclusory assertions" insufficient to support irreparable harm); *Harley Marine NY, Inc. v. Moore*, No. 23-cv-00163, 2023 WL 3620720, at *8 (N.D.N.Y. Mar. 24, 2023) (finding no irreparable harm where movant had "not shown that alleged injuries to its market standing or client relations will be non-economic beyond making conclusory assertions").

Plaintiffs explain the harm to their tax business as consisting of several related obstacles: (1) filing returns by mail is inadequate; (2) fees for return preparation cannot be collected directly from customer returns; (3) SL Tax will need to terminate employees; and (4) the business will lose customers and profits. Whether considered together or separately, plaintiffs have not made a strong showing that these anticipated harms are of such a magnitude that would threaten the existence of SL Tax as a whole. *See JTH Tax*, 62 F.4th at 668.

---

[7] Much of plaintiffs' argument regarding irreparable harm consists of assertions that the government acted with intent to cause harm when deciding to suspend the EFINs. *See* Mot. at 16 ("The IRS criminal investigators acted intentionally pursuant to a plan to cause irreparable harm to SL Tax, the target of their incomplete criminal investigation, to put it out of business before their investigation was even complete."). At the Hearing, the Court asked plaintiffs if it "need[s] to find that the IRS had bad intent" in order to find irreparable harm, to which plaintiffs' counsel replied: "You don't, Judge, it's just another reason why you should." Prelim. Inj. Hr'g Tr. 84:6–17. The irreparable harm standard does not require the Court to query into the intent of non-movants, and the Court declines to do so here.

There is no question that plaintiffs' tax business will suffer some amount of harm due to the suspension of their EFINs. Approximately "99 percent" of SL Tax's business "is tax filing." Prelim. Inj. Hr'g Tr. 81:15. Since the EFIN suspension, SL Tax has had "a reduction in clientele, a reduction in billables and a reduction in receipts, in money collected" and is "already talking layoffs" because it "can't afford [its] staff on the amount of money [it is] making right now." Prelim. Inj. Hr'g Tr. 75:13–17, 77:9–15, 79:15–23. These are significant harms. But plaintiffs have not established that those reductions in clientele, profits, and employees will manifest in such proportions as to threaten the "very viability" of SL Tax. *JTH Tax*, 62 F.4th at 668. They offer no specifics as to how those reductions will "impact overall profitability." *Gazzola*, 645 F. Supp. 3d at 57. Nor do they explain why those reductions cause existential concern at SL Tax.

To the contrary, plaintiffs demonstrated their ability to continue their tax preparation business by submitting returns on behalf of their customers by mail, even while their EFINs are suspended. *See* Prelim. Inj. Hr'g Tr. 104:16–105:11; *see also* Def.'s Post-Hr'g Br. at 2 n.1; Pls.' Post-Hr'g Br. at 2 n.1 (referencing specific IRS forms that "unequivocally provide that a tax preparer with a suspended EFIN may file tax returns by mail"). Plaintiffs contend that filing returns by mail is "not a substitute for e-filing and places SL Tax at a substantial competitive disadvantage," Pls.' Post-Hr'g Br. at 2, in part because mailing returns is "unreliable," slow, and inefficient, Holtz Decl. ¶ 27, Prelim. Inj. Hr'g Tr. 75:21–76:12. Yet by early April, Plaintiffs had nonetheless been able to collect "tens of thousands" of dollars from "a few hundred" customers after the EFIN suspension. Prelim. Inj. Hr'g Tr. 70:15–71:2, 73:14–74:13.

Plaintiffs have offered no context for these figures. They have not provided concrete financial comparisons, nor have they proffered evidence of SL Tax's annual

13

profits or revenue. For example, plaintiffs do not argue that "tens of thousands" of dollars constitute only a small portion of their typical revenue by the beginning of April, or that such an amount is inadequate to cover a month—or two, or three—of plaintiffs' operating costs. Nor do they argue that a "few hundred" customers represents a small fraction of SL Tax's usual customer base by that time in light of the fact that plaintiffs file roughly two thousand returns each year. Nor were plaintiffs able to state how much of their 30-person workforce may have to be terminated without a preliminary injunction. Prelim. Inj. Hr'g Tr. 79:15–23 ("I don't yet know [how many employees SL Tax will have to lay off] because the damage is yet to be known, but several."); *see also* Holtz Decl. ¶ 3 ("SL Tax currently has approximately 30 employees."). These unmoored numbers do not provide the Court with information necessary to determine that plaintiffs' business will be irreparably harmed.

In fact, plaintiffs' counsel described mailing returns as a "mitigation" effort put in place to avoid destruction of the business. *See* Prelim. Inj. Hr'g Tr. 107:13–19. On this record, where plaintiffs are able to continue their tax preparation business despite the drawbacks of mailing customer returns, plaintiffs have not met the requisite strong showing that SL Tax's business *as a whole* will suffer irreparable damage.

Further, plaintiffs have not demonstrated that an inability to collect customers' fees from their refunds constitutes irreparable harm. Mr. Holtz testified that "75 percent of our clients . . . typically will pay their fees from the refund" through a third-party bank. Prelim. Inj. Hr'g Tr. 76:13–77:4; *see also* Holtz Decl. ¶ 13. But there is no indication that SL Tax cannot collect fees for its service through other means after customers have received their full refunds. In fact, as noted *supra*, Mr. Holtz testified that plaintiffs have indeed collected customer fees this tax season. *See* Prelim. Inj. Hr'g Tr. 73:14–74:13.

14

Although doing so without a third-party service may be inefficient and "cause[] a severe competitive disadvantage to SL Tax," Holtz Decl. ¶ 13, this obstacle does not appear to irreparably harm plaintiffs based on the current record.

Additionally, where a movant has the ability to calculate lost profits and goodwill based on a business's long history of operation, a finding of irreparable harm is not warranted. *See Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011).[8] This certainly may be true for SL Tax given its operation for over five decades. The Court acknowledges, however, that plaintiffs' "right to continue" their tax business "is not measurable entirely in monetary terms." *JTH Tax*, 62 F.4th at 668. For the past 54 years, Mr. Holtz and his family have operated a tax preparation business in New York. Mot. at 6. They now employ roughly 30 people. Mot. at 6. However, unlike the cases in which the Second Circuit has found irreparable harm where family-owned businesses faced "obliterat[ion]," *see JTH Tax*, 62 F.4th at 668, Mr. Holtz's prediction that he will no longer have a business absent preliminary injunctive relief is not supported by the record currently before the Court. Indeed, in certain respects that prediction is contradicted by the record. Nor has Mr. Holtz established that his own livelihood depends on the success of the business. *See id.* (finding

---

[8] When asked at the Hearing why "monetary damages [would] not account for any lost profits," plaintiffs' counsel admitted their uncertainty as to whether plaintiffs could bring such a suit "against the Internal Revenue Service and the United States government for damages resulting from an unconstitutional deprivation of [Mr. Holtz's] ability to do his business." *See* Prelim. Inj. Hr'g Tr. 81:17–25, 82:18–83:24. *See also Weiner v. I.R.S.*, 986 F.2d 12, 13 (2d Cir. 1993) ("Congress has enacted a thicket of statutes that protect federal employees from liability for the improper execution of their duties[.]"); *but see Zherka v. Ryan*, 52 F. Supp. 3d 571, 580 (S.D.N.Y. 2014) (finding First and Fifth Amendment claims "cognizable in a *Bivens* action" and noting "the simple fact that constitutional rights, if they are to be rights at all, must have some discernible remedy."). That is a fair question, but not one argued by the parties nor addressed in their post-hearing briefing. *See generally* Pls.' and Def.'s Post-Hr'g Brs. This issue is therefore not properly before the Court at this time.

irreparable harm in part because "if [the] business were closed, [the movant] would be unable to provide for her family"). This combination—of damages that are likely calculable, coupled with the lack of evidence as to a total threat to the business—supports the Court's conclusion that plaintiffs have not made a strong showing of irreparable harm.

Plaintiffs rely almost exclusively on *Brenner Income Tax Centers* to argue that "there is no question SL Tax is threatened with irreparable harm." Mot. at 15–16 (discussing *Brenner Income Tax Centers, Inc. ex rel. Brenner v. Dir. of Prac. of I.R.S.*, 87 F. Supp. 2d 252, 256 (S.D.N.Y. 2000)).[9] However, the irreparable harm analysis in *Brenner* was limited. The court found that the plaintiff's livelihood would be threatened absent preliminary restoration of his ability to electronically file tax returns with the IRS because "tax preparation is his business and livelihood, and because electronic filing constitutes a significant portion of his business." *Brenner*, 87 F. Supp. 2d at 256. That reasoning is not dispositive here, where, as discussed *supra*, plaintiffs have not made the requisite factual showing that the viability of their business will be damaged nor that Mr. Holtz's livelihood depends on the success of this business. The Court may not rely on *Brenner* to presume irreparable harm absent such a showing. *See WPIX,* 691 F.3d at 285 (holding that irreparable harm must be demonstrated on the facts, not presumed by the Court).

Without demonstrating non-compensable damages, plaintiffs have failed to satisfy their burden to make a strong showing of irreparable harm necessary for a preliminary

---

[9] The government did not initially include any argument contesting irreparable harm. *See* Opp'n. After the Court pressed the issue at oral argument, Prelim. Inj. Hr'g Tr. 91:15–24, the government included a short analysis in its post-hearing briefing. *See* Def's Post-Hr'g Br. at 2.

injunction. *See CollaGenex Pharms., Inc. v. IVAX Corp*, 375 F. Supp. 2d 120, 132 (E.D.N.Y. 2005) (harms "emanat[ing] from an expected sharp drop in revenue" insufficient for injunctive relief); *WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 503 (S.D.N.Y. 2011) ("purely financial" harm insufficient for preliminary injunction); *JDS Grp. Ltd. v. Metal Supermarkets Franchising Am., Inc.*, No. 17-cv-6293, 2017 WL 2643667, at *4 (W.D.N.Y. June 20, 2017) (the "extraordinary remedy of a preliminary injunction is inappropriate" where the "Court cannot conclude that any [harm] . . . is so great as to impair plaintiff's ability to continue operating its business").

## CONCLUSION

For the reasons stated above, the Court **DENIES** plaintiffs' motion for a preliminary injunction without prejudice.

**SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　*/s/ Natasha C. Merle*
　　　　　　　　　　　　　　　　　　　　　　　NATASHA C. MERLE
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

Dated:　　　June 7, 2024
　　　　　　Brooklyn, New York

17